AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Kansas

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information Associated with<br>"low168@hotmail.com" that is stored at the premises<br>controlled by Microsoft, Inc. see attachment A | )<br>)<br>)   Case No. 15-mj-6117-01-KGG<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Western _____ District of _____ Washington _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1952 | Interstate Transportation in Aid of Racketeering |
| 18 U.S.C. 2422 | Attempted Coercion and Enticement |

The application is based on these facts:

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Carl Hummell, SA DHS, ICE, INS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: June 9, 2015

*Judge's signature*

City and state: Wichita, KS

Kenneth G. Gale, United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH "low168@hotmail.com" THAT IS STORED AT PREMISES CONTROLLED BY MICROSOFT, INC. | Case No. 15-m-6117-01-KGG |

## AFFIDAVIT

I, Carl Hummell, being duly sworn, depose and state:

### INTRODUCTION

1. I am a Special Agent with the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), formerly the Immigration and Naturalization Service (INS), in Wichita, Kansas (RAC Wichita), and have been so employed since June 1996. As part of my daily duties as an HSI agent, I investigated criminal violations relating to the trafficking of individuals for forced labor and commercial sex acts, under Chapter 77 of the Title 18 of the United States Code.

2. This affidavit is made in support of an application for a search warrant to search for and seize instrumentalities, fruits and evidence of violations of:

   a. Title 18 U.S.C. § 1952, that is, using a facility of interstate commerce to promote, manage, establish, and carry on prostitution offenses; and

   b. Title 18 United States Code (U.S.C.) § 2422, that is, persuading, inducing, enticing, or coercing, or attempting to do so, any individual to travel in interstate commerce to engage in prostitution.

3.      The items that are the subject of the search and seizure applied for in this affidavit are more specifically described in Attachment A and B.  I make this affidavit in support of an application for a search warrant for the email account "low168@hotmail.com".  The e-mail service provider for this email account is Microsoft, Inc., located at One Microsoft Way, Redmond, Washington, 98052, and they maintain this account on their servers for use by their customers.

4.      The government may use a search warrant to obtain subscriber information and records, including the contents of the subscriber's account(s).  18 U.S.C. § 2703(a), (b)(1)(A), (c)(1)(A).  Unlike traditional Federal Rule of Criminal Procedure (Rule 41) warrants, warrants issued pursuant to section 2703 may be used to compel records held in another district, so long as the warrant is issued by a court with jurisdiction over the criminal offense under investigation.  Affiant asserts this Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  Specifically, this Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

5.      Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  Also, pursuant to Title 18, United States Code, Section 2703(b)(1)(A), where such a warrant is obtained, no notice to the subscriber or customer is required to be given.

**INFORMATION THAT MAY BE AVAILABLE FROM THE SERVICE PROVIDER**

6.      In my training and experience, I have learned that companies that offer e-mail service such as Microsoft, AOL, Google, and Yahoo! (hereinafter "e-mail service providers")

provide a variety of on-line services, including electronic mail ("e-mail") access, to the general public. These e-mail service providers allow subscribers to obtain e-mail accounts at their domain names [such as hotmail.com and live.com (Microsoft); aol.com (AOL, Inc.); gmail.com (Google); and yahoo.com, ymail.com and sbcglobal.net (Yahoo!)]. Subscribers obtain an account by registering with those respective companies. During the registration process, these e-mail service providers ask subscribers to provide basic personal information. Therefore, the computers of these companies are likely to contain stored electronic communications (including retrieved and un-retrieved e-mail for the e-mail subscribers) and information concerning subscribers and their use of these e-mail provider's services, such as account access information, e-mail transaction information, and account application information.

      a. In general, an e-mail that is sent to a subscriber is stored in the subscriber's "mail box" on this company's respective servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on the provider's servers indefinitely.

      b. When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to the provider's servers, and then transmitted to its end destination. The provider often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the provider's server, the e-mail can remain on the provider's system indefinitely.

      c. Sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by the provider but may not include all of these categories of data.

      d. A subscriber can also store files, including e-mails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by the provider.

      e. In general, the providers of Internet-based email services ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including

any credit or bank account number). Generally, the providers do not verify the accuracy of the information entered by the user.

f.  Typically, the providers of Internet-based email services retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the various websites), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

g.  In some cases, e-mail account users will communicate directly with the provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Most providers retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

h.  In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

i.  When served with a search warrant for electronic communications, the provider will send the contents of specified email account to the investigating agency, usually on a CD or DVD, for the investigator to review.

j.  The provider can copy the contents of the entire account because that is within their expertise. Though the provider affirms that the records relate to the specified email account, the provider does not and will not undertake the examination of the contents of an email account to make a determination as to what is relevant or irrelevant to the investigation, or to determine what may or may not be privileged information.

k.  The provider copies the account as the provider finds it at the time of service of the search warrant (unless a preservation letter was sent earlier). **The information provided to law enforcement is only the information currently stored or maintained in the account – it may not, and likely is not, the entire account containing every email since the account's creation.** This means law enforcement is provided a snapshot of the account on a particular date.

l.  Generally, and in this case particularly, the provider is not familiar with the investigation and is not in a position to identify the victim(s) or subject(s) of the investigation.

m.  The provider is neither qualified nor trained to search the account as would a law enforcement officer. Only a trained agent, familiar with the facts of the case can determine what items should or should not be seized. An untrained ISP employee is likely to seize too much to avoid any suggestion that 1) s/he has interfered with a legitimate law enforcement investigation or 2) has defied a court order. For these reasons, your Affiant requests the provider reproduce the records listed in Section 1 of Attachment B, for the email account listed in Attachment A.

n.  Further, because the nature of the criminal venture involves avoiding detection, it is typical for individuals to use code in communications, to mislabel attachments, or to otherwise disguise communications about the criminal venture. Additionally, evidence of who was using the e-mail account may be found in a variety of locations. These include: the actual e-mail correspondence in the account, because the content will sometimes include reference to names, either in salutations, signatures, or in the message content itself; attachments to e-mails, including pictures and files, because the content of those may include identifiers such as self-portraiture or depicting other physical identifiers, or textual references that include names or addresses, such as an invoice or receipt; address books, contact or buddy lists, because these may show familial contacts or other associates who can identify the user of the email account. Sometimes, an email that appears unrelated on its face (such as a receipt for an internet purchase) provides information (such as a name or credit card number) that identifies the user of the account. For these reasons, the law enforcement investigator must be allowed to review all of the contents of the account, for the evidence listed in Section 2 of Attachment B.

7.  Affiant knows from training and experience that promoters of prostitution, particularly those that rely upon internet marketing and interstate communication with sources of female sex workers, utilize electronic means of communications to conduct their business. Activities related to the recruitment of workers, transportation and harboring of workers, advertising of businesses, payment of bills, and communication of business strategy with co-conspirators frequently occur in a web of digital communications, which may include phone calls, text messages, postings to online message boards (such as posts or advertisements on Backpage.com), and through electronic mail.

## DETAILS OF INVESTIGATION/PROBABLE CAUSE

8. The information in this affidavit is information known to me as a result of my participation in this investigation or is information that has been communicated to me by other law enforcement investigators and witnesses, involved in this investigation. Since this affidavit is being submitted for the limited purpose of supporting a seizure warrant for the account listed in Attachment A, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only those facts that I believe are necessary to establish the existence of probable cause to support a search warrant.

9. This information set forth below is providing a broad overview of the investigation conducted to date. It does not include a listing of all investigative techniques employed or even the full and complete results of any of the listed investigative efforts.

10. Over the course of five years, from roughly June 2010 to the present, the Wichita Police Department Vice section has undertaken a broad investigation into the operation of so-called Asian massage parlors as fronts for prostitution in Wichita and surrounding area. Over that period of time, Kay TEE has been identified as an individual associated with the establishment, operation, and advertising of such prostitution businesses, including:

   a. During the summer of 2010, law enforcement learned that Kay TEE's cellphone number (316-371-3883) was listed as the emergency contact on leasing paperwork for Oriental Massage, a parlor operating at 2312 W Pawnee #102 in Wichita. Kay TEE was also listed as the second contact. In July 2010, law enforcement interviewed three different male who were observed leaving Oriental Massage at different times, and each described being offered sex acts in exchange for money (and two described the performance of a sex act in exchange for money).

   b. On September 8, 2010, law enforcement conducted several undercover operations, targeting parlors where Asian female workers offered sex acts in

exchange for money. These included Massage 600, Sunflower Spa, Eastern Massage, and Oriental Massage, all of which were associated with Kay TEE.

c. In Massage 600, Yinghua Han was arrested for prostitution. The search of the parlor revealed a handwritten Chinese-English translation dictionary for phrases commonly used in a massage parlor, but also included sexually explicit phrases including "did you bring condom" and "happy ending". In a later debriefing, Xiuqing Tian (co-defendant in 13-CR-10129) described writing portions of this red notebook, and staying at the residence of Kay TEE, at 15112 E. Sweetgum along with Yinghua HAN, during the summer of 2010.

d. On September 8, 2010, law enforcement conducted a search of Kay TEE's business, KT USA Systems, and found an airfare receipt for Yinghua Han was found in KT USA SYSTEMS, the business of Kay TEE. This receipt included an email address of "low168@yahoo.com."

e. During this same search, law enforcement found a document relating Oriental Massage which indicated Kay TEE would receive two-thirds of the profit from the business. Review of records of the Kansas Secretary of State show "Oriental Massage Inc" was formed on November 3, 2009, and the articles of incorporation list "KT" as the incorporator.

f. During this same search, law enforcement found print-outs of several Craigslist advertisements for Sunflower Spa which included "low168@yahoo.com." In a search of Sunflower Spa, law enforcement found documents advertising for Sunflower Spa and Eastern Massage in the same notice, using the "low168@yahoo.com" address.

g. In his Mirandized interview with law enforcement on September 8, 2010, Kay TEE told law enforcement he assisted his girlfriend Katie TANG in operating her massage businesses, and provided services and technical assistance to the owners of other parlors, including Sunflower. He admitted to transporting workers from Oriental Massage and Eastern Massage. He further admitted to doing the advertising on Craigslist and Backpage.

h. On May 10, 2012, the Vice section conducted an operation on Magical Spa, 550 N. Webb. An arrest was made for prostitution. A search warrant was served on the business. A receipt was located from Kay TEE's business, KT USA SYSTEMS.

i. On February 15, 2013, the Vice section conducted an operation on Diamond Spa, 326 E. Harry and made an arrest for prostitution. A search warrant was served on the business. A piece of paper with Kay TEE's name and telephone number was located on a wall of the business. Later, on March 22, 2013, then Detective Aaron Harrison accompanied city code inspectors to Diamond Spa at 326 E. Harry looking for code violations. The massage therapist called Kay TEE and

had Det. Harrison speak to him about the violations. Kay TEE was the apparent management for this parlor.

j. On April 19, 2013, then City Attorney Mike Hoelscher observed Kay TEE in the courtroom with Jing Xie during a motion on Xie's prostitution case from Therapy Massage, 330 S. Greenwich. On April 22 and 23, 2013, TEE appeared again with Xie, during the appeal of her prostitution case.

k. On May 15, 2013, Det. SHEA observed Kay TEE in Wichita Municipal Court with Hong QI, during her prostitution trial from activities in Diamond Spa at 326 E. Harry.

l. On May 17, 2013, the Vice section conducted an undercover operation at Phoenix Spa, and made an arrest for prostitution. The operator, Pik LI, advised Kay TEE was her "friend." Subsequent review of documents filed with the Kansas Secretary of State show an "annual report" submitted for Phoenix Spa, LLC, doing business at 6249 E 21st, Suite 122, Wichita, Kansas, on June 7, 2013, with an email of "low168@yahoo.com."

m. On June 26, 2013, Kay TEE called the WPD Vice section office and requested property seized from search warrants conducted at Therapy Massage, 330 S. Greenwich #326 and Diamond Spa, 326 E. Harry. Again, Kay TEE advised he posts ads in the Prospector to aid Chinese people. Kay TEE also advised that law enforcement should check Candy Spa at 2330 N. Maize #1300 for illegal activity, i.e., prostitution.

n. In March of 2015, the WPD Vice section again conducted an undercover operation at 330 S. Greenwich, #326. Again, a female worker, Yan Liu, offered to provide a sexual act in exchange for money. Liu was arrested for prostitution, and a search warrant was obtained for the parlor. While inside the parlor, Liu's cellphone and the parlor's phone begin to ring, both showing Kay TEE's phone number. At around 2:00am, while the detectives were still inside the parlor awaiting approval of the search warrant, they heard a loud knock at the rear door of the parlor, accompanied by a male voice yelling unintelligibly. The phones continued to ring while being called by Kay TEE. This went on for several minutes. The rear of the parlor is not marked, nor does it have a celebrated entrance; thus indicating familiarity with the parlor. When a detective exited out the front to establish exterior surveillance, a chime sounded, and the knocking stopped. A small engine vehicle was heard to start and drive off, and shortly thereafter a silver Toyota RAV4 parked in front of the parlor. Kay TEE was recognized getting out of the vehicle and trying to look in through the blinds.

o. After a search warrant was obtained for the parlor, law enforcement found a K-1 tax document from Kay TEE's business, KT USA SYSTEMS. Additionally, the lease issued to Yan Liu listed "TEE" as an emergency contact with his cellphone number of 316-371-3883.

p. Subsequent review of documents filed with the Kansas Secretary of State show two "annual reports" submitted for China Health, LLC, doing business at 330 S. Greenwich, #326, Wichita, Kansas. These were submitted on February 15, 2013, and again on February 25, 2014, both with an email of "low168@hotmail.com."

11. On March 28, 2015, a Confidential Human Source (CHS-1) placed a recorded phone call to Kay TEE at 316-371-3883. CHS-1 posed as a massage worker in New York seeking to open a parlor in Wichita. TEE agreed to help CHS-1 open a parlor in Wichita, beginning with scouting locations for a fee of $500. He requested the CHS-1 to wire money to his Bank of America account ending in 8317. He called back and offered to sell the CHS-1 an existing parlor business. CHS-1 agreed to discuss this further with TEE and ended the call.

12. On April 2, 2015, CHS-1 placed a recorded phone call to TEE at 316-371-3883. TEE stated he had a parlor he could sell the CHS-1. He said the actual owner was currently out of town and would return on late Sunday (April 5, 2015). He needed to confirm that the owner still wanted to sell her business. He stated the CHS-1 would be able to read reviews from customers of this parlor on www.rubmaps.com. (Sargent Dan OBLINGER of the WPD Vice section knows that this website is an erotic massage parlor message forum, allowing patrons to post their prostitution escapades and to rate parlors and sex workers on the basis of their sexual services and prices.) TEE also stated the parlor in question offered "little action," a term of art that the CHS-1 knew to mean manual stimulation of male genitals for hire. TEE stated this parlor had good business, between 4 and 8 patrons a day, which OBLINGER has learned to be a steady rate of income for the Wichita erotic massage industry. TEE and the CHS-1 agreed to discuss this further after TEE spoke with the owner of the parlor in question.

13. In subsequent phone calls, TEE told CHS-1 that the parlor in question was no longer available, and that he could set up a parlor for her himself if she wished to pay.

14. In May of 2015, CHS-1 was contacted by another owner of a Wichita massage parlor operating as a commercialized prostitution enterprise. This owner (CHS-2) was interested in bringing CHS-1 from another state to work in the operator's parlor. The Wichita Police Vice section had arrested an employee of this massage parlor for prostitution on February 6, 2015 when CHS-2 was present. CHS-1 used the same pseudonym and phone number to contact CHS-2 as CHS-1 used to contact TEE. CHS-1 contacted CHS-2, who agreed to hire CHS-1 as a prostitute from out of state.

15. On May 15, 2015, CHS-2 arrived at the Eisenhower National Airport in Wichita, was arrested, and taken to meet SHEA for an interview. During the interview, CHS-2 provided detailed information about Kay TEE and his connection to criminal enterprise in massage businesses in Wichita. This person was enlisted as a confidential human source (CHS-2).

16. On May 15, 2015, CHS-2 made a recorded phone call to TEE and informed him there was trouble at CHS-2's parlor, and that CHS-2 wished to sell it. TEE stated he could find a buyer.

17. On May 16, 2015, CHS-2 spoke with TEE again with SHEA present. CHS-2 informed TEE that she was able to connect with a buyer in Flushing, New York who spoke good English. CHS-2 intended to sell the parlor to this person in New York. TEE quickly asked what the buyer's name was, and CHS-2 provided it. TEE provided CHS-1's phone number and inquired if this was the right number of the buyer. CHS-2 stated it likely was the same. TEE immediately claimed that CHS-1 was his customer and that he had arranged for CHS-1 and CHS-2 to connect to sell CHS-2's business (this representation was false). TEE told CHS-2 to pay him whatever CHS-2 wanted and told CHS-2 to contact CHS-1 to make this arrangement.

After this call disconnected, TEE called CHS-1 and left a message informing CHS-1 that CHS-2 would be calling.

18. On May 18, 2015, CHS-1 made a recorded call to TEE. TEE told CHS-1 that CHS-1 shouldn't buy CHS-2's store, and instead he would open up a parlor for CHS-1. TEE said the police had come to shut down CHS-2's store and CHS-2 was in a lot of trouble. TEE stated it was a half-service operation and CHS-2 would have to go to court. When CHS-1 indicated she was still interested in the parlor, TEE stated he would still pick CHS-1 up at the airport and take CHS-1 to CHS-2's shop. TEE quoted CHS-1 $500 for the arrangement. TEE stated he could also handle business advertising for CHS-1.

19. On May 20, 2015, CHS-2 made a recorded call to TEE. CHS-2 told TEE the deal to sell the parlor to CHS1 was done and that CHS-1 would arrive by airplane on May 28, 2015. TEE told CHS-2 to sell to CHS-1. Tee stated that his fee was $500.

20. On May 20, 2015, SHEA and OBLINGER debriefed CHS-2 regarding TEE. CHS-2 stated the following:

   a. TEE helps massage parlors in Wichita, by doing handy man work, construction, advertising, obtains and transports female workers, installs camera systems, and performs tax preparation for these businesses.

   b. One of the girls who worked for CHS-2 told CHS-2 not to fight TEE because everyone is scared of him.

   c. In the past, TEE has offered to do taxes for CHS-2 for a fee of $440.

   d. CHS-2 has been to his business at 2818 S. Hydraulic and believes the taxes are prepared by his girlfriend, Katie TANG whom CHS-2 has met many times when TANG has been working there as an accountant.

e.  TEE also mentioned to CHS-2 that the ads for CHS-2's business are not sexy enough and that TEE would do better advertising for a fee, on Backpage and Craigslist.

f.  TEE showed CHS-2 that he had a live video feed on his personal cell phone from Diamond Spa's cameras on Rock Road.

g.  TEE has provided two female massage workers for CHS-2 in the past, one from Diamond Spa at 180 S. Rock and the other had worked at a lot of unspecified massage parlors in Wichita. TEE told CHS-2 that he could get girls from Las Vegas, NV if CHS-2 needed one.

21. On May 21, 2015, CHS-1 made a recorded call to TEE. TEE continued to warn CHS-1 of the police investigation into CHS-2's business. CHS-1 told TEE that CHS-1 had bought the parlor and paid a down payment to CHS-2, and that CHS-1 was not deterred by the police activity. CHS-1 told TEE that CHS-1 intended to offer manual stimulation of the male genitals during massages, but would be careful to avoid police action. CHS-1 asked TEE if CHS-2 would pay TEE's fee. TEE told CHS-1 that each of them needed to pay $500. TEE further instructed CHS-1 to pay TEE an additional $550 for him to file 5 government documents when CHS-1 arrived, and that he would pick CHS-1 up at the airport and drive CHS-1 to the parlor. TEE told CHS-1 to withhold $500 from the sale price if CHS-2 did not pay TEE the fee.

22. On May 27, 2015, Kay TEE called CHS-1 and left a message to confirm CHS-1's arrival. CHS-1 returned TEE's call to confirm the arrival time. CHS-1 further stated that CHS-1 spoke to CHS-2 and is confident that CHS-1 can do manual stimulation in the shop and not arouse police suspicion. CHS-1 asked TEE what he could do to help. TEE advised he could help with everything, including tax preparation. TEE reiterated he would pick up CHS-1 at the airport.

23. Later on May 27, 2015, CHS-2 called TEE and stated CHS-2 spoke with CHS-1. CHS-2 asked if CHS-2 could pay a portion of TEE's finder fee. TEE advised his girlfriend

(known to be Katie TANG) would text CHS-2 the routing number for his bank account. CHS-2 agreed to send $100 to TEE's account. Shortly thereafter, CHS-2 received a text message with a photo attachment of a check front, showing Bank of America account number ending in 8317 styled as Alert America, 2106 S. Broadway (a business known to be operated by Kay TEE).

24. CHS-2 went to a Bank of America branch and presented $100 in cash for deposit into the above account, which the teller accepted and deposited into the account.

25. On May 28, 2015, Kay TEE drove to the Wichita airport to pick up CHS-1, and was taken into custody. He agreed to speak to law enforcement, after Miranda warning. TEE advised that Yan Liu was living at 2910 N. Meadow Oaks Court, a residence owned by TEE. Liu was known to law enforcement as the worker arrested for prostitution out of 330 S. Greenwich on March 27, 2015. Liu was later observed by law enforcement leaving the residence at 2910 N. Meadow Oaks Court.

26. On June 1, 2015, in response to a subpoena for records relating to "low168@yahoo.com" and "low168@hotmail.com" between May 1, 2013 to present (June 1, 2015), Backpage.com provided the following records:

   a. A series of advertisements posted using the "low168@yahoo.com" account, for "Diamond Spa" at "180 S Rock Road, Suite 500." The advertisements were continuous from June 21, 2014 to May 26, 2015. The advertisements repeatedly featured pictures of scantily-clad or provocatively-posed Asian females. Headers for the advertisements included phrases such as "Sexy Asian Hotties For U," "EVERY Man's Fantasy Asian Hotties for U," "Killer Body Sexy Diamond Spa," "Hotties every day @ Diamond Spa," "100% Real Beauty," "Sweet sexxie girl ready to please you", "Asian doll looking for U," and "Sexy Lady Must Come." The administrative data associated with the advertisements indicated the User was created on Monday, June 21, 2010. Invoices from February 24, 2015 to May 12, 2015 show the user as "low168@yahoo.com" with the customer as "Kay T Tee" with an address of 2818 S Hydraulic, Wichita, KS. That address is the address of KT USA SYSTEMS.

b. An advertisement posted using the "low168@yahoo.com" account for "Massage" at "326 E Harry" on July 1, 2014. The 326 E Harry address is known to be associated with Diamond Spa, referenced above in paragraphs 10(i) and 10(m). The advertisement featured several pictures of scantily-clad or provocatively-posed Asian females. The administrative data associated with the advertisement indicates the User was created on Monday, June 21, 2010.

c. A series of advertisements posted using the "low168@hotmail.com" account, for "Asian Massage Spa" at "East 21st Street & North Woodlawn (Next to KFC)." These advertisements were posted from January 12, 2015 to January 17, 2015. The parlor at East 21st and North Woodlawn correlates to Phoenix Spa, referenced above in paragraph 10(l). The advertisement features several pictures of scantily-clad or provocatively-posed Asian females. The administrative data associated with the advertisements indicate the User was created on Thursday, October 14, 2010.

27. Based on the records provided by Backpage.com, these email accounts have been associated with user profiles created in June 2010 and October 2010. Despite the limited request by law enforcement for records going back to May 2013, the administrative data indicates long-term usage of the email accounts for the purposes of advertising on Backpage.com.

28. Affiant believes Kay TEE has historically used, and continues to actively use, both email accounts to facilitate the operation of prostitution businesses, to include advertising, travel arrangements, and filings with the Kansas Secretary of State. Because the accounts themselves are being used to facilitate the crimes described herein, Affiant believes that the accounts may be seized as an instrumentality of the crime, similar to a computer, for examination similar to a computer.

29. Based on the foregoing, Affiant believes a search of e-mails sent, received, drafted, and deleted, as well as attachments to these e-mails, in the email accounts "low168@yahoo.com" and "low168@hotmail.com," will divulge information that is likely to show evidence of violations of 18 U.S.C. §§ 1952 and 2422, occurring in Wichita, Kansas and elsewhere. Further, your Affiant believes that the contents of the accounts are likely to show evidence identifying additional

conspirators, transactional information related to the prostitution enterprise, and the discovery of previously unknown victims of sex trafficking or transportation for purposes of prostitution.

30.    Your affiant further asserts that there is probable cause to believe that such evidence is located on the computer systems of Microsoft, Inc., located at One Microsoft Way, Redmond, Washington, 98052, within the e-mail account of "low168@hotmail.com."

31.    Wherefore by this affidavit and application, your affiant request that the court issue a search warrant which would allow agents to seize the e-mail and other information stored on the Yahoo! Inc. system for the e-mail account identified in this affidavit, including the information further described in Attachments A and B.

_____
Carl Hummell
Special Agent, HSI

Subscribed and Sworn before me this 9th day of June, 2015.

_____
The Honorable Kenneth G. Gale
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A: LOCATION TO BE SEARCHED

This warrant applies to information associated with the following e-mail accounts:

**low168@hotmail.com**

that is stored at premises owned, maintained, controlled, or operated by **Microsoft, Inc.**, a company accepting legal process at One Microsoft Way, Redmond, Washington, 98052.

# ATTACHMENT B: ITEMS TO BE SEIZED

I. **Information to be disclosed by Microsoft, Inc.:**

To the extent that the information described in the affidavit is within the possession, custody, or control of **Microsoft, Inc., Microsoft, Inc.** is required to disclose the following information to the government for each account or identifier listed in Attachment A:

   a.   The contents of any and all e-mails stored in the account, including copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

   b.   All records or other information regarding the identification of the e-mail account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

   c.   All records or other information stored by an individual using the account, including address books, contact and Friends lists, calendar data, pictures, and methods of payment for any premium services.

II. **Information to Be Seized By the Government:**

All information described above in Section I that constitutes contraband, fruits, evidence and instrumentalities of violations of **Title 18, U.S.C. Sections 1952 and 2422**, including, for the account or identifier listed on Attachment A ("Location to Be Searched"), information pertaining to the following matters:

   a.   Data or content tending to show the user of the account, including but not limited to subscriber information, IP logs, alternative email accounts, address books, friend-lists or buddy-lists, headers, salutations, and email content referencing the user or other identifier information such as names, nicknames, credit card numbers, phone numbers, self-portraiture, or physical addresses;

   b.   Data or content relating to the persuading, inducing, enticing, and coercing of individuals to travel in interstate or foreign commerce to engage in prostitution,

including but not limited to travel receipts, itineraries, maps, and the identities and whereabouts of victims, witnesses, and co-conspirators;

c. Data or content relating to the promotion, management, establishment, carrying on or facilitation of businesses associated with commercial sex acts, including but not limited to receipts, invoices, tax documents, bank account information, and other information which may reveal the identities and whereabouts of such businesses, victims, witnesses, or co-conspirators; and

d. Data or content showing the identities of individuals that benefitted financially from participation in a venture involving commercial sex acts and "massage" businesses or other businesses associated with commercial sex acts.